UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
                                                    :
GAS NATURAL, INC.,                                  :
                                                    :
                              Plaintiff,            :
                                                    :               No. 13-cv-6333 (RA)
              -v-                                   :
                                                    :               OPINION AND ORDER
IBERDROLA, S.A. and IBERDROLA U.S.A.,               :
INC.,                                               :
                                                    :
                              Defendants.           :
                                                    :
----------------------------------------------------------X

RONNIE ABRAMS, United States District Judge:

In this action for breach of contract and promissory estoppel, Plaintiff alleges that

Defendants violated their obligation to negotiate in good faith for the sale of their subsidiary,

New Hampshire Gas Corp. ("New Hampshire Gas"). According to the Complaint, after signing

a May 16, 2013 Letter of Intent ("Letter of Intent" or "LOI") that bound them to negotiate in

good faith, Defendants violated that duty by breaking off negotiations with Plaintiff and selling

New Hampshire Gas to a third party.

Before the Court is Defendants' motion to dismiss the Complaint for failure to state a

claim. The Court concludes that Plaintiff has plausibly alleged that the LOI bound the parties to

negotiate in good faith. The Complaint does not plausibly allege, however, that Defendants

breached this duty. In view of the parties' conscious decision not to include an exclusivity

provision in the LOI, the duty of good faith did not require Defendants to negotiate exclusively

with Plaintiff, disclose the existence of competing offers, or correct any mistaken belief that it

was the only party interested in purchasing New Hampshire Gas. Accordingly, Defendants'

motion is granted.

## BACKGROUND

As it must on a motion to dismiss, the Court draws the following facts from the Complaint and Letter of Intent, which Plaintiff attached as an exhibit to its Complaint and which the Complaint references repeatedly. See, e.g., New York Life Ins. Co. v. United States, 724 F.3d 256, 258 n.1 (2d Cir. 2013) (explaining that, on a motion to dismiss, a court may consider documents attached to the complaint and those on which the complaint relies). Neither party disputes that the Court may consider the Letter of Intent in connection with this motion.

According to the Complaint, on January 21, 2013, Plaintiff first contacted Defendants through a broker to express interest in purchasing New Hampshire Gas. (Compl. ¶ 10.) Over the months that followed, the parties began negotiations and exchanged several draft letters of intent. (Id. ¶¶ 11-14.)

One of the key points of discussion concerned whether Defendants would negotiate with other parties. The Complaint alleges that "on multiple occasions" after a March 12, 2013 draft letter of intent was sent to Defendants, "Gas Natural expressed to Defendants that [it] expected exclusivity." (Id. ¶¶ 12-13.) Subsequently, on May 8, 2013, Defendants sent a revised draft letter of intent, which did not contain an exclusivity provision. According to the Complaint, a representative of Defendants, Thorn Dickinson, then told Plaintiff that "we can discuss an exclusivity clause once we are further advanced." (Id. ¶ 15 (alteration omitted).) In a May 13, 2013 email, a representative from Plaintiff advised that the company's chairman "was adamant on having exclusivity," and stated "I know we all understand most likely there isn't someone else out there . . . ." (Id. ¶ 18.) In response, Dickinson allegedly "did not object" to the "representation that both parties understood that Gas Natural was the only company Defendants were in negotiations with concerning a potential sale of New Hampshire Gas." (Id. ¶ 20.)

Despite Plaintiff's requests, the final version of the Letter of Intent—which Plaintiff executed on May 16, 2013, and Defendants on June 4, 2013 (id. ¶ 22 & Ex. A at 2)—did not contain an exclusivity clause.

The Letter of Intent begins by "set[ting] out the terms" on which Defendants will "grant access to the information relating to" Plaintiff's interest in purchasing New Hampshire Gas—the "Transaction"—and describes the "arrangements applying to [the parties'] discussions." (May 16, 2013 Letter of Intent at 1.) In "consideration of [Plaintiff's] interest shown in relation to the Transaction," Defendants explain, they will "undertake[ ] to devote the necessary time and resources to negotiate the Transaction in good faith with Gas Natural during the period of forty-five (45) days from the date" the LOI was executed. (Id. at 1; Compl. ¶ 27.) Consistent with this undertaking, Defendants agreed, within the forty-five-day period, to grant Plaintiff access to confidential information; prepare and provide a "Definitive Agreement" for the purchase of New Hampshire Gas; and provide "a mutually acceptable resolution" to certain litigation that affected New Hampshire Gas. (LOI at 1-2.) During the same forty-five-day period, Plaintiff was to complete "a due diligence process" and "initiate the required processes with the aim of obtaining all necessary internal" approvals and permits that could be required as a precondition to the Transaction. (Id. at 1.)

After laying out the terms of the negotiations, the LOI provides: "This letter (including the agreement constituted by [Plaintiff's] acknowledgement of its terms) shall be governed by and construed in accordance with the laws of the State of New York." (Id. at 2.) Any "appropriate state or federal district court located in" Manhattan was to have "exclusive jurisdiction over any case or controversy arising under or in connection with" the letter, "including the agreement constituted by [Plaintiff's] acknowledgement of its terms." (Id.)

The final substantive paragraph of the two-page Letter of Intent states that "Notwithstanding the foregoing, this letter constitutes a non-binding letter of intent and that no contract or agreement related to the Transaction or any legal obligations resulting therefrom shall be deemed to exist unless and until a Definitive Agreement has been executed and delivered by all necessary parties." (Id. at 2.)

According to the Complaint, when the forty-five-day period elapsed on July 19, 2013, the parties agreed "to extend the good faith negotiation period through September 1, 2013." (Compl. ¶ 27.) On August 1, 2013, however, "Defendants unilaterally terminated negotiations with Gas Natural," explaining that they "had received a competing offer for the acquisition of New Hampshire Gas." (Id. ¶¶ 31-32.)

Plaintiff alleges that "both before and after the Letter of Intent was executed, Gas Natural made it known to Defendants that Gas Natural understood that Gas Natural was the only potential buyer interested in New Hampshire Gas." (Id. ¶ 28.) Despite these communications, Plaintiff alleges, "at no time prior to Defendants' unilateral termination of negotiations did Defendants ever suggest that Defendants were seeking other potential buyers, let alone that they had received an alternate offer for the acquisition of New Hampshire Gas." (Id. ¶ 29.) Defendants, the Complaint alleges, thus "deceitfully led Gas Natural to believe there had been no third-party interest in the purchase of New Hampshire Gas." (Id. ¶ 30.)

Plaintiff filed its Complaint on September 10, 2013. In its first claim, for breach of contract, it alleges that the Letter of Intent obligated Defendants to negotiate in good faith, and that they breached this duty "by, *inter alia*, leading Gas Natural to believe that it was the only interested buyer with which Defendants were discussing a potential sale of New Hampshire Gas, and by unilaterally terminating negotiations with Gas Natural after receiving a competing offer

4

for the purchase of New Hampshire Gas." (Id. ¶ 38.)  In its second claim, for promissory estoppel, Plaintiff alleges that it relied on Defendants' promise "to negotiate in good faith" and that, "[i]n reasonable reliance on that promise, Plaintiff incurred expenses it would otherwise not have incurred related to the acquisition of New Hampshire Gas." (Id. ¶¶ 41-42 (alteration omitted).)

Defendants moved to dismiss, and the Court heard oral argument on their motion on July 11, 2014.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Although the Court must accept as true all factual allegations in a complaint, it need not credit "mere conclusory statements." Id.  Nor need it credit factual allegations that are "contradicted by more specific allegations" or by "documentary evidence" submitted with the complaint. L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 422 (2d Cir. 2011).

## DISCUSSION

To establish a breach of contract claim under New York Law—which the parties agree governs here—Plaintiff must plausibly allege "(1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach. Diesel Props S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 52 (2d Cir. 2011).  A claim for promissory estoppel requires Plaintiff to show "1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a

result of the reliance." Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir. 2000).

Defendants' motion to dismiss presents two issues that bear on both claims. First is the question of whether Defendants were obligated to negotiate in good faith, whether by way of contractual obligation or "clear and unambiguous promise." If so, the Court must consider whether Plaintiff has plausibly alleged that Defendants violated their duty of good faith. If their actions, according to the Complaint, were consistent with the duty of good faith, they could not have breached their contract, nor could Plaintiff have been injured as a result of reasonable reliance on Defendants' promise.

## 1.    Whether an Obligation to Negotiate in Good Faith Exists

Whether the LOI imposes an obligation to negotiate in good faith is a question that may well have been taken from a first-year contracts exam. Strong textual arguments can be made in favor of both Plaintiff and Defendants, and discerning the parties' intent is a difficult task. Ultimately, the Court concludes that the Complaint plausibly alleges that the LOI obligated the parties to negotiate in good faith.

### A.    Legal Principles

The Second Circuit has explained that, under New York law, "where the parties contemplate further negotiations and the execution of a formal instrument," a preliminary agreement ordinarily "does not create a binding contract." Brown v. Cara, 420 F.3d 148, 153 (2d Cir. 2005). "In some circumstances, however, preliminary agreements can create binding obligations." Id.

Adopting a framework first articulated by then-District Judge Leval, see Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co., 670 F. Supp. 491 (S.D.N.Y. 1987), the Second Circuit

6

classifies binding preliminary commitments into two "types," <u>Brown</u>, 420 F.3d at 153.[1] Those in the first category—"Type I agreements"—constitute "fully binding agreements, which are created when the parties agree on all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document." <u>Vacold LLC v. Cerami</u>, 545 F.3d 114, 124 (2d Cir. 2008) (alterations omitted). Parties who have entered into a Type I agreement are "fully bound to carry out the terms of the agreement even if the formal instrument is never executed." <u>Id.</u>

Type II agreements, on the other hand, are preliminary commitments that are "binding only to a certain degree because the parties agree on certain major terms, but leave other terms open for further negotiation." <u>Id.</u> (alterations omitted). These agreements "do not commit the parties to their ultimate contractual objective," but rather "bind the parties to the obligation to negotiate the open issues in good faith in an attempt to reach the objective within the agreed framework." <u>Id.</u> "If the parties fail to reach such a final agreement after making a good faith effort to do so, there is no further obligation." <u>Id.</u>

In this case, Plaintiff is not attempting to enforce the underlying transaction. (<u>See, e.g.</u>, Pl.'s Mem. of Law at 1.) No party asserts that the LOI is a Type I agreement. Rather, the

---

[1]     In a footnote addressing whether a settlement agreement was binding, the New York Court of Appeals noted that federal courts had divided preliminary agreements into two types, and explained: "While we do not disagree with the reasoning in federal cases, we do not find the rigid classifications into 'Types' useful." <u>IDT Corp. v. Tyco Grp.</u>, 13 N.Y.3d 209, 215 n.2 (2009). The Court of Appeals found that the case before it could be resolved by asking a more straightforward question: "whether the agreement contemplated the negotiation of later agreements and if the consummation of those agreements was a precondition to a party's performance." <u>Id.</u>

In a case handed down after <u>IDT</u>, however, the Second Circuit drew on the "Type I" / "Type II" framework. <u>SSP Capital Partners, LLP v. Mandala, LLC</u>, 402 F. App'x 572, 573 (2d Cir. 2010). Courts in this District have also continued to use the framework. <u>See, e.g.</u>, <u>Sawabeh Info. Servs. Co. v. Brody</u>, 11 CIV. 4164 SAS, 2014 WL 46479, at *10 (S.D.N.Y. Jan. 6, 2014); <u>Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC</u>, 861 F. Supp. 2d 344, 356 (S.D.N.Y. 2012). Accordingly, absent guidance from the Second Circuit or the New York Court of Appeals to the contrary, this Court will continue to rely on the framework.

question is whether the LOI constitutes a Type II agreement.

The Second Circuit has articulated five factors relevant to determining whether an agreement is a Type II agreement and therefore imposes an obligation to negotiate in good faith. Those factors are "(1) whether the intent to be bound is revealed by the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions." Brown, 420 F.3d at 157. "The first factor, the language of agreement, is the most important." Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 72 (2d Cir. 1989).

When applying these factors, the Court is mindful of the need to balance two competing policy concerns. On the one hand, courts must "avoid trapping parties in surprise contractual obligations that they never intended." Id. at 156-57. At the same time, "courts must enforce and preserve agreements that were intended to be binding, despite a need for further documentation or further negotiation. Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc., 145 F.3d 543, 548 (2d Cir. 1998). Otherwise, as Judge Leval explained, "parties would be obliged to expend enormous sums negotiating every detail of final contract documentation before knowing whether they have an agreement, and if so, on what terms." Tribune, 670 F. Supp. at 499.

**B.      Application**

The Court begins by considering the first, and most important, factor: "whether the intent to be bound is revealed by the language of the agreement." Brown, 420 F.3d at 157.

Defendants' argument on this point hinges almost exclusively on the final substantive paragraph of the LOI. They assert that, in that clause, "the parties said *three different ways* that the LOI is entirely non-binding." (Defs.' Reply at 2.)

8

The first portion of that paragraph states that "[n]otwithstanding the foregoing, this letter constitutes a non-binding letter of intent." (LOI at 2.) Although "not necessarily controlling," labels "such as 'letter of intent' or 'commitment letter'" may "be helpful indicators of the parties' intentions." Tribune, 670 F. Supp. at 497. The phrase "[n]otwithstanding the foregoing" would further seem to override any binding obligations the LOI otherwise purports to impose.

The final paragraph continues by explaining that "no contract or agreement related to the Transaction or any legal obligations resulting therefrom shall be deemed to exist unless and until a Definitive Agreement has been executed and delivered by all necessary parties." (LOI at 2.) Several aspects of this language support a conclusion that the parties did not intend to be bound.

Although Plaintiff asserts that the statement that "no contract or agreement related to the Transaction . . . shall be deemed to exist" refers only to obligations related to the actual purchase of New Hampshire Gas (Pl.'s Mem. of Law at 6),[2] that reading imposes a narrow construction of the phrase "related to." It is difficult to say that an agreement to negotiate the Transaction in good faith is not an "agreement related to the Transaction." Moreover, whatever the ambiguous phrase "resulting therefrom" refers to—whether the Transaction, a "contract or agreement related to the Transaction," or the LOI itself (mentioned earlier in the sentence)—this language appears to reaffirm the parties' intentions not to impose any legal obligations. Conditioning the nonexistence of legal obligations on the occurrence of an event—"no contract or agreement . . . shall be deemed to exist *unless and until a Definitive Agreement has been executed*"[3] (id. at 2 (emphasis added))—further supports a conclusion that the LOI is not a Type II agreement, see

---

[2]     The opening paragraph of the LOI explains: "We refer to your interest to acquire [sic] the New Hampshire Gas, Corp. (the "**Interest**") a wholly-owned subsidiary of Iberdrola, S.A. ("**Iberdrola**" or the "**Company**") for a total purchase price in U.S. Dollars of Two Million Five Hundred Thousand Dollars ($2,500,000) (the "**Transaction**"). (LOI at 1.)

[3]     The LOI defines the "Definitive Agreement" as "a proposed purchase and sale agreement for the transfer of the Interest" that Defendants would provide to Plaintiff. (LOI at 1.)

Beekman Inv. Partners, L.P. v. Alene Candles, Inc., 05 CIV.8746 DLC, 2006 WL 330323, at *1, *7 (S.D.N.Y. Feb. 14, 2006) (concluding that a document was not a Type II agreement, because it stated "The above terms do not constitute a definitive offer, acceptance, contract, or agreement, all of which require the completion of our due diligence and will be incorporated in a definitive purchase agreement duly executed by the Seller and [Plaintiff]"); HP Hotel Sponsor, LLC v. Strategic Capital Solutions, LLC, 29 Misc. 3d 1204(A), 958 N.Y.S.2d 307 (N.Y. Sup. Ct. 2010) ("The court holds that the Letter is not a Type II binding preliminary commitment. It expressly provides that the parties will not be bound in the absence of a formal, executed writing. The Letter contains an explicit statement of the parties' intent not to be bound in any other way, except as to the sections where a contrary intent is expressly stated." (citations omitted)).

At the same time, however, other language in the LOI supports the conclusion that the LOI is indeed a Type II agreement. The LOI states specifically that "Iberdrola undertakes to devote the necessary time and resources to negotiate the Transaction in good faith with Gas Natural during the period of forty-five (45) days." (LOI at 1.) That Defendants undertook to negotiate "in good faith" over a specific period suggests voluntary acceptance of an obligation, not simply a description of the current state of negotiations. See Bulldog New York LLC v. Pepsico, Inc., 3:08CV1110 AWT, 2014 WL 1284903, at *17 (D. Conn. Mar. 31, 2014) ("[T]he statements . . . specifically note that the parties will work together in 'good faith over the next 120 days' to consummate the 'next phase of the Project.' This language evokes 'the essence of a Type II preliminary agreement' in that 'it creates an 'obligation to negotiate the open issues in good faith in an attempt to reach the ultimate contractual objective within the agreed framework." (citations and alterations omitted)).

Moreover, the LOI provides that "[t]his letter (including *the agreement* constituted by

your acknowledgement of its terms) shall be governed by and construed in accordance with the laws of the State of New York"; the LOI asks Plaintiff to "[p]lease acknowledge *your agreement* to the above by signing and returning the enclosed copy"; and by signing their names the parties indicated that they "acknowledge[d] and agree[d] to the above." (LOI at 2 (emphases added).) Describing the LOI as an "agreement" weighs heavily in favor of finding that it imposed obligations consistent with a Type II agreement. See Vacold LLC v. Cerami, 545 F.3d 114, 127 (2d Cir. 2008) (concluding that a letter imposed binding duties, and noting that it "was styled a 'letter agreement,' whereas all five previous drafts were styled a 'summary of discussions' or the like"); Tribune, 670 F. Supp. at 499 (finding the existence of a Type II agreement and emphasizing that "[i]n signing, Tribune used the words 'Accepted and agreed to'").

The structure of the LOI also suggests that the document was a Type II agreement. The LOI obligated Defendants to grant Plaintiff "access to all Confidential Information" consistent with a separately-executed confidentiality agreement; Plaintiff, meanwhile, was to complete "a due diligence process" within the forty-five-day period (a process it began, see Compl. ¶ 25) and obtain necessary internal approvals (LOI at 1).

These provisions lead the Court to conclude that the first factor—the language of the agreement—weighs more strongly in favor of Plaintiff. The parties' description of the LOI as a "non-binding letter of intent," while relevant, is not determinative. See Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc., 765 F. Supp. 2d 403, 415 (S.D.N.Y. 2011) ("[T]he phrase 'this Memorandum is not a binding legal obligation' is not dispositive here.") Similarly, although the more natural construction of the phrase "related to the Transaction" encompasses an obligation to negotiate the Transaction in good faith, the final substantive paragraph of the LOI could be construed as indicating only the parties' intent not to be bound to execute the ultimate

Transaction.

Indeed, adopting the opposite construction would render a number of other terms in the contract superfluous. If the LOI merely "memorialized the parties' contemporaneous intentions" (Defs.' Mem. of Law at 2), why "undertake[ ] to devote the necessary time and resources to negotiate the Transaction in good faith" for a period of forty-five days, "[i]n consideration of [Plaintiff's] interest shown"? Why specify certain actions that each party will take, including granting access to confidential information and completing a due diligence process? Why state that "[t]his letter (including the agreement constituted by [Plaintiff's] acknowledgement of its terms)" shall be governed by New York law or refer "any case o[r] controversy arising under or in connection with" the letter to New York courts, which contemplates legal action resulting from the LOI? This language—of "consideration," of "undertak[ing] . . . to negotiate . . . subject to" certain "terms and conditions"—more strongly suggests the existence of a binding contract.

The second and fourth factors—the context of the negotiations and partial performance— also weigh in favor of Plaintiff. The Complaint alleges that the parties exchanged several drafts of the LOI (Compl. ¶¶ 12-17), which has been found to support the existence of a Type II agreement, see Learning Annex, 765 F. Supp. 2d at 415 (finding that a document that was "the culmination of several months of discussions and negotiations between the parties" weighed in favor of finding a Type II agreement). Perhaps most significantly, the parties agreed to extend the forty-five-day negotiation period described in the LOI. (Id. ¶ 27.) If the LOI were meant simply to memorialize the state of negotiations as of a certain date, the Court is at a loss for why the parties would need to extend the forty-five-day negotiation period.

Even assuming that the two remaining factors—the existence of open terms and whether it is customary to put such agreements in final form—support Defendants, these factors are

12

outweighed by the other three factors—the language of the agreement, the context of negotiations, and the parties' partial performance. At this stage, the Court simply cannot conclude that Plaintiff has failed to allege the existence of a Type II contract as a matter of law.

**2.     Whether Defendants Acted in Bad Faith**

The next question is whether, even assuming that the LOI imposed an obligation to negotiate in good faith, Plaintiff has plausibly alleged that Defendants violated that obligation. The Court concludes that it has not.

**A.     Legal Principles**

The Second Circuit has explained the purpose of an agreement to negotiate in good faith as follows: "In effect, an agreement to agree buys a party an assurance that the transaction will falter only over a genuine disagreement, thus allowing a party strapped for time or money to go ahead with arrangements with a sufficient degree of confidence in the outcome." L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 430 (2d Cir. 2011) ("L-7 Designs I"). A party "may abandon the transaction" as long as it has "made a good faith effort to close the deal" and has "not insisted on conditions that do not conform to the preliminary writing." Id.

As Judge Chin, sitting by designation, recently remarked in the L-7 Designs case, "[i]n the context of the obligation to negotiate in good faith pursuant to a preliminary binding agreement, the parameters of what constitutes good faith, or bad faith, are not clearly delineated." L-7 Designs, Inc. v. Old Navy, LLC, 964 F. Supp. 2d 299, 307 (S.D.N.Y. 2013) ("L-7 Designs II"). Judge Chin was able to draw some "generalizations," however, each of which this Court finds instructive. Id.

First, "at the very least, good faith requires honesty in fact." Id. at 307. Each party must provide an "honest[ ] articulation of interests, positions, or understandings." Penguin Grp.

(USA) Inc. v. Steinbeck, 06CV2438(GBD), 2009 WL 857466, at *2 (S.D.N.Y. Mar. 31, 2009).

Second, "self-interest is not bad faith." L-7 Designs II, 964 F. Supp. 2d at 307. In an analogous context—whether a publisher made good faith attempts to promote a book—the Second Circuit explained that, to show bad faith, plaintiff would need to demonstrate that defendants' acts were "undertaken for reasons other than a good faith business judgment." Zilg v. Prentice-Hall, Inc., 717 F.2d 671, 681 (2d Cir. 1983). Citing Judge Posner's decision in Venture Associates Corp. v. Zenith Data Systems Corp., 96 F.3d 275, 279 (7th Cir. 1996), Judge Chin explained that "[a]cting in one's financial self-interest, for example, in response to market changes, does not constitute bad faith."[4] L-7 Designs II, 964 F. Supp. 2d at 307.

Third, "bad faith requires some 'deliberate misconduct'—arbitrary or capricious action taken out of spite or ill will or to back out of an otherwise binding contractual commitment." Id. at 308. A party acts in bad faith if it "renounce[es] the deal, abandon[s] the negotiations, or insist[s] on conditions that do not conform to the preliminary agreement." L-7 Designs I, 647 F.3d at 430. "Thus, 'trying to scuttle the deal' or to take advantage of expenditures made by the other side to advance the project may constitute bad faith, depending on the circumstances. L-7 Designs II, 964 F. Supp. 2d at 308; see, e.g., Network Enterprises, Inc. v. APBA Offshore Prods., Inc., 427 F. Supp. 2d 463, 486 (S.D.N.Y. 2006) aff'd, 264 F. App'x 36 (2d Cir. 2008) (concluding that a party acted in bad faith by refusing to provide information in one discussion so as to gain leverage in a different, but related, negotiation). Courts in this District find bad faith when a party attempts to alter the terms on which the parties have already reached agreement. See, e.g., EQT Infrastructure Ltd. v. Smith, 861 F. Supp. 2d 220, 231 (S.D.N.Y. 2012) ("As I have found it plausible that the LOI was a Type II agreement, the obligation to

---

[4]     In Venture Associates, the Seventh Circuit concluded that the defendant had not "locked itself into" the purchase price, and was free to adjust that price based on market conditions. 96 F.3d at 279. Here, in contrast, the LOI—which was executed by both parties—specified a $2.5 million sale price.

negotiate in good faith did not expire on September 8, 2010, and thus the imposition of a new condition in October could violate that obligation."); Teachers Ins. & Annuity Ass'n of Am. v. Ormesa Geothermal, 791 F. Supp. 401, 415 (S.D.N.Y. 1991) ("By, among other things, insisting upon a lowered interest rate, [defendant] attempted to change and undercut terms that had been agreed to in the Commitment letter.").

Finally, "whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact." Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 98 (2d Cir. 2007). What "good faith" requires varies on a case-by-case basis: "the boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract." Cross & Cross Properties, Ltd. v. Everett Allied Co., 886 F.2d 497, 502 (2d Cir. 1989); accord L-7 II, 964 F. Supp. 2d at 307.

**B.    Application**

Although the question of whether a party acted in good faith typically is not suitable for resolution on a motion to dismiss, see Tractebel, 487 F.3d at 98, courts have, on occasion, decided the issue at the pleading stage. See, e.g., Miller Auto. Corp. v. Jaguar Land Rover N. Am., LLC, 471 F. App'x 37, 39 (2d Cir. 2012) (affirming district court's 12(b)(6) dismissal of claim for failure to negotiate in good faith). The Supreme Court's decisions in Twombly and Iqbal require at least some assessment of whether the Complaint has alleged facts that "nudge" an assertion that a party has acted in bad faith "across the line from conceivable to plausible." Ashcroft v. Iqbal, 556 U.S. 662, 680 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Here, the Court concludes that "[s]horn of its conclusory assertions, the Complaint

simply fails to allege facts sufficient to state a plausible claim" that Defendants acted in bad faith during their negotiations with Plaintiff. Miller Auto. Corp., 471 F. App'x at 39.

The Complaint specifies two ways in which Defendants purportedly acted in bad faith: they "le[d] Gas Natural to believe that it was the only interested buyer with which Defendants were discussing a potential sale of New Hampshire Gas" and they "unilaterally terminat[ed] negotiations with Gas Natural after receiving a competing offer for the purchase of New Hampshire Gas." (Compl. ¶ 38.)

Three facts alleged in the Complaint are critical to the Court's analysis as to whether Plaintiff has adequately alleged bad faith. First is the allegation that Plaintiff "expressed to Defendants" that it "expected exclusivity." (Compl. ¶ 13.) Second is the fact that, despite that expectation, Defendants did not put an exclusivity clause in an initial draft of the letter of intent, and their representative explicitly stated to Plaintiff "we can discuss an exclusivity clause once we are further advanced." (Id. ¶¶ 14-15 (alteration omitted).) Third is the fact that, despite Plaintiff's repeated insistence on exclusivity (see, e.g., id. ¶¶ 18-19), the final version of the LOI that the parties executed did not contain an exclusivity clause (id. ¶ 28).

The assertion that Defendants acted in bad faith by terminating negotiations after receiving a competing offer for the purchase of New Hampshire Gas can be addressed, and rejected, summarily. It is perhaps plausible that, in some instances, the duty of good faith might preclude a seller from soliciting offers from, or otherwise negotiating with, third parties. See Venture Associates, 96 F.3d at 277 (noting that "the concept of good faith" might "entail" an "obligation not to entertain other offers"); Bear Stearns Inv. Products, Inc. v. Hitachi Auto. Products (USA), Inc., 401 B.R. 598, 628 (S.D.N.Y. 2009) ("The question for trial is therefore, whether Hitachi breached its obligation of good faith by secretly re-marketing the Delphi Claims

16

and selling them to Deutsche Bank while it was still engaged in talks with Bear Stearns."). But in this case, according to the Complaint, the parties specifically contemplated and rejected an exclusivity clause. (See Compl. ¶ 15.) Construing the duty of good faith so as to require exclusivity would be a "back door" means of re-inserting a clause that the parties rejected. In other words, doing so would "trap[ ]" Defendants "in surprise contractual obligations that they never intended to undertake." Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc., 145 F.3d 543, 548 (2d Cir. 1998).

Whether the duty of good faith obligated Defendants to disclose that they had received competing offers—or at least correct Plaintiff's alleged misunderstanding that it was the only interested party—presents a closer question. Good faith, to be sure, "requires honesty in fact." L-7 Designs II, 964 F. Supp. 2d at 307. At the same time, however, in order to show a breach of the duty of good faith, Plaintiff must plausibly allege "some 'deliberate misconduct'—arbitrary or capricious action taken out of spite or ill will or to back out of an otherwise binding contractual commitment." Id. at 308.

If the Complaint alleged that Defendants affirmatively misrepresented their intent to seek other bids or the presence of interested third parties, then the outcome of the case might be different.[5] Here, however, the Complaint alleges only that (1) Defendants "did not object" to the statement in a May 13, 2013 email from Plaintiff's representative that "I know we all understand most likely there isn't someone else out there . . ." (Compl. ¶¶ 18-20); (2) that despite repeated statements by Plaintiff that it understood itself to be the "only potential buyer interested in New Hampshire Gas," Defendants never "suggest[ed] that Defendants were seeking other potential buyers, let alone that they had received an alternative offer for the acquisition of New Hampshire

---

[5]       When asked at oral argument whether Plaintiff was seeking leave to amend its Complaint, it asserted that it was not. (See July 11, 2014 Tr. at 20.)

Gas" (Id. ¶¶ 28-29); and (3) that Defendants "deceitfully led Gas Natural to believe there had been no third-party interest in the purchase of New Hampshire Gas" (Id. ¶ 30).[6]

Once again, by attempting to construe the duty of good faith so broadly—to require affirmative disclosure of the existence of interested third parties—Plaintiff seeks to impose an obligation that, based on the allegations of the Complaint, Defendant never accepted. The statement by Defendants' representative that the parties could "discuss an exclusivity clause once we are further advanced" (Compl. ¶ 15), is equivalent to a statement that Defendants did not wish, at that time, to restrict themselves to negotiating only with Plaintiff.[7] "[J]udicial experience and common sense," Iqbal, 556 U.S. at 679, suggest that when one party indicates that it will not negotiate exclusively with a second party, the first party is entitled to consider—and accept—competing offers from third parties. If Plaintiff—a sophisticated entity involved in a multimillion dollar acquisition—was so concerned about losing out to a third party, it could have (1) required Defendants to state in writing that they had not received other offers; (2) insisted on a right of first refusal; or (3) refused to sign the LOI absent an exclusivity clause. According to the Complaint, Plaintiff did not take any of these steps.

The Court thus concludes that the Complaint does not plausibly allege that Defendants violated the duty of good faith. Accordingly, Plaintiff fails to state a claim for breach of contract.

## 3.    Plaintiff's Promissory Estoppel Claim

Much of the preceding discussion speaks in terms of whether Defendants "breached" the

---

[6]      The Complaint does not allege any facts supporting this assertion—that Defendants "deceitfully led Gas Natural to believe" no third parties were interested—aside from its allegations that Defendants did not correct Plaintiff's alleged misunderstanding about the interest of third parties.

[7]      Indeed, the statement by Plaintiff's representative, Greg Osborne, that "I know we all understand most likely there isn't someone else out there," reinforces this proposition. (Compl. ¶ 18.) The phrase "most likely" recognizes the uncertainty about the presence of interested third parties—uncertainty occasioned by Defendants' unwillingness to agree to an exclusivity clause.

duty of good faith.  A claim for promissory estoppel, as noted above, requires Plaintiff to demonstrate "1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance." Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir. 2000).  "Promissory estoppel is a narrow doctrine designed to enforce a contract in the interest of justice where some contract formation problem would otherwise prevent enforcement—for example, the Statute of Frauds or a failure of consideration." BNP Paribas Mortgage Corp. v. Bank of Am., N.A., 949 F. Supp. 2d 486, 516 (S.D.N.Y. 2013).

Here, there is no "contract formation problem" that "would otherwise prevent enforcement": the Court concluded that the parties did enter into a binding obligation to negotiate in good faith.  The promissory estoppel claim is thus duplicative of the breach of contract claim. See, e.g., Simpri v. City of New York, 00 CIV. 6712 (SAS), 2003 WL 23095554, at *8 (S.D.N.Y. Dec. 30, 2003) (dismissing promissory estoppel claim that was identical to breach of contract claim).

The promissory estoppel claim fails for another reason.  Plaintiff has not plausibly alleged that it suffered injury as a result of reasonable reliance on a promise Defendants made.  As described above, even assuming that the LOI constitutes a sufficiently "clear and unambiguous promise" to negotiate in good faith, the Complaint does not plausibly allege that Defendants failed to act in good faith.  Plaintiff thus cannot plausibly allege that it suffered an actionable "injury" as a result of reliance on Defendants' promise, because it has not plausibly alleged that Defendants acted in a way inconsistent with that promise.

## CONCLUSION

For these reasons, Defendants' motion to dismiss the Complaint is GRANTED.  The Clerk of Court is respectfully requested to terminate the motion pending at docket number 15

and to close the case.

SO ORDERED.

Dated:          July 17, 2014
                New York, New York


                                            Ronnie Abrams
                                            United States District Judge